**No. 60263.**—Ebeling & Reuss Company *v.* United States, protests 146559–K, etc. (Philadelphia).

LAWRENCE, Judge: On the call of the nine cases enumerated in the schedule of protests, attached to and made part of our decision herein, counsel for plaintiff moved their consolidation for the purposes of trial and, there being no objection by opposing counsel, the court so ordered.

Due to the variety of articles, the classification of which is here in question, it is deemed advisable at the outset to list the merchandise according to item and the corresponding invoice item numbers:

| Item | Invoice item Nos. |
| --- | --- |
| Forks | 1004, 1007, 10025, or 10030 |
| Spoons | 1001, 1002, 1003, 1004, 1005, 10014, 10015, 10025, 10026, 10027, 10028, or 10040 |
| Frames | 120, 121, or 122 |
| Cocktail or cherry picks | 1006 |
| Letter opener or paper cutters | 1008, 10028, or 10040 |
| Tongs or cake tongs | 10010 |
| Sandwich servers | 10011 or 10024 |
| Corks | 10016 |
| Pie servers | 10017 |
| Funnels | 10018 |
| Tongs or sugar tongs | 10019 |
| Tongs or ice tongs | 10020 |
| Candle snuffers or extinguishers | 10021 |
| Tea strainer | 10022 |
| Tea strainer stands | 10023 |
| Pin trays | 10033 |
| Nut or bon bon dishes | 10039 |
| Pheasants | 10041 |

It is considered to be of further assistance to enumerate the various consumption entry numbers and commercial invoices which cover the controverted merchandise:

| Entry No. | R. Schenk & Co., Inc., invoice | Case Nos. | Protest No. |
|---|---|---|---|
| 10010 | C–47/173 4/28/47 | 166–169 | 146559–K |
| Wh. 10402 | C–47/265 6/3/47 | 175–180 | 146559–K |
| Wh. 215 | C–47/356 7/14/47 | 192–201 | 159908–K |
| Wh. 260 | C–47/366 7/24/47 | 202–203 | 154870–K |
| 773 | C–47/399 8/7/47 | 204–207 | 151934–K |
| 1110 | C–47/429 9/2/47 | 208–215 | 148361–K |
| 1412 | C–47/438 9/8/47 | 216–223 | 147251–K |
| 1680 | C–47/464 9/22/47 | 224–230 | 148361–K |
| 1865 | C–47/522 10/13/47 | 231–238 | 147251–K |
| 2084 | C–47/541 10/27/47 | 239–243 | 151934–K |
| 2346 | C–47/560 11/10/47 | 244–250 | 151934–K |
| Wh. 1509 | C–47/617 12/5/47 | 251–257 | 154869–K |
| 2822 | C–47/638 12/17/47 | 258–261 | 147250–K |
| 2893 | C–47/639 12/23/47 | 262–265 | 151934–K |
| 3451 | C–48/19 1/26/48 | 266–276 | 148361–K |
| 3541 | C–48/13 2/3/48 | 277–282 | 151933–K |

Upon importation of the various shipments, all items of forks, whether less or more than 4 inches in length, exclusive of handle, were classified by the collector of customs within the following provision of paragraph 355 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 355), as modified by the British Trade Agreement, 74 Treas. Dec. 253, T. D. 49753, or by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, and subjected to duty at the rate of 16 cents each and 35 per centum ad valorem:

| Tariff Act of 1930, paragraph | Description of Products | Rate of Duty |
|---|---|---|
| 355 | Table, butchers', carving, cooks', hunting, kitchen, bread, cake, pie, slicing, cigar, butter, vegetable, fruit, cheese, canning, fish, carpenters' bench, curriers', drawing, farriers', fleshing, hay, sugar-beet, beet-topping, tanners', plumbers', painters', palette, artists', shoe, and similar knives, forks, and steels, and cleavers, all the foregoing, finished or unfinished, not specially provided for: <br> *   *   *   *   *   *   * <br> With handles of silver (other than plated with silver, or other metal than aluminum, nickel silver, iron or steel_____ | 16¢ each and 35% ad val. |

The parties have agreed that the items of forks, Nos. 1007, 10025, and 10030, are less than 4 inches in length, exclusive of handle. It is the contention of plaintiff that said items should properly have been classified within the provisions of paragraph 355, as modified by the British Trade Agreement or by the General Agreement on Tariffs and Trade, *supra*, as forks "with handles of nickel silver or steel other than austenitic." "If less than four inches in length, exclusive of handle," for which duty at the rate of 2 cents each and 25 per centum ad valorem is provided. As to the items of forks No. 1004, it has been agreed between the parties that such forks are 4 inches in length, exclusive of handle, and it is the contention of plaintiff that said articles should properly have come within the immediately preceding provision of modified paragraph 355, except for length, duty for such articles being 4 cents each and 25 per centum ad valorem.

All other controverted items covered by the protests enumerated in the schedule, attached to and made part of this decision, were classified by the collector of customs as table and household utensils or flatware, not specially provided for, plated with silver on metal, other than nickel silver or copper, in paragraph 339 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 339), or as modified by the General Agreement on Tariffs and Trade, *supra*, and assessed with duty at the rate of 50 per centum or 35 per centum ad valorem, respectively. It is plaintiff's contention that said articles should have been classified within the following provisions of said paragraph 339, as modified by the British Trade Agreement or by the General Agreement on Tariffs and Trade, *supra*:

Paragraph 339, as modified by the British Trade Agreement, *supra*—

| Tariff Act of 1930; paragraph | Description of article | Rate of duty |
|---|---|---|
| 339 | Table, household, kitchen, and hospital utensils, and hollow or flat ware, not specially provided for:<br>    Plated with silver on nickel silver or copper__ | 35% ad val. |

Paragraph 339, as modified by the General Agreement on Tariffs and Trade, *supra*—

| Tariff Act of 1930; paragraph | Description of Products | Rate of duty |
|---|---|---|
| 339<br><br>* | Table, household, kitchen, and hospital utensils, and hollow or flat ware, not specially provided for * * *:<br>*      *      *      *<br>    Plated with silver but not plated in any part with platinum:<br>        On nickel silver or copper_____ | *    *<br><br>25% ad val. |

Since it is agreed by the parties that the articles in controversy are silver plated, the issue to be determined narrows itself into the single consideration of whether the articles are composed of nickel silver, and there is agreement between the parties that, to constitute an article of nickel silver, it must contain 65 percent of copper, a minimum of 5 percent and not more than 25 percent of nickel, and a minimum of 10 percent and not more than 30 percent of zinc, all percentages being on a weight basis.

As plaintiff's collective exhibit 1, there were received in evidence, to the extent that they relate to the merchandise presently under protest before the court, the commercial invoices of R. Schenk & Co.

Early in the trial proceedings, counsel for the parties orally stipulated and agreed to the following facts:

1. That the 50 percent rate of duty in paragraph 339 was decreased to 35 percent by virtue of T. D. 51802 as to table, household, and kitchen utensils or flatware, plated with silver on metal other than aluminum, nickel silver, or copper, effective as to merchandise entered for consumption, or withdrawn from warehouse for consumption, on or after January 1, 1948; that the spoons, nut dishes, tongs, sandwich servers, pie servers, tea strainers, letter openers, funnels, tea stands, and picks covered by the entries listed below, and assessed with duty at 50 percent in paragraph 339, were returned by the collector as household utensils plated with silver on metal other than aluminum, nickel silver, or copper (not enameled or glazed with vitreous glasses), and were entered for consumption after January 1, 1948—

Protest 154869–K, entry WH 1509, date of entry 12/29/47 (released from bonded warehouse 1/6/48).

Protest 147250–K, entry 2822, dated 1/15/48.

Protest 151934–K, entry 2893, dated 1/16/48.

2. It was agreed that the basic metal constituent in all of the articles under protest in the nine protests now before the court would have been classified as nickel silver (other than austenitic) if the presence of nickel therein had been found to be 5 percent or more by weight, and that nickel silver is composed of about 65 percent copper, a minimum of 5 percent and not more than 25 percent of nickel, and a minimum of 10 percent and not more than 30 percent of zinc, all percentages being on a weight basis.

3. All of the articles under protest in the nine protests now before the court are silver plated.

In view of the agreement of the parties that the spoons, nut dishes, tongs, sandwich servers, pie servers, tea strainers, letter openers, funnels, tea stands, and picks, covered by entry 1509 accompanying protest 154869–K and entry 2893 accompanying protest 151934–K, as well as entry 2822 accompanying protest 147250–K, which were classified by the collector of customs as table and household utensils or flatware, not specially provided for, plated with silver on metal, other than nickel silver or copper, in paragraph 339 of the Tariff Act of 1930 and assessed with duty at the rate of 50 per centum ad valorem. were withdrawn from warehouse or entered for consumption after January 1, 1948, the rate of duty applicable to said merchandise should have been 35 per centum ad valorem by virtue of said paragraph 339, as modified by the General Agreement on Tariffs and Trade, *supra*. To that extent, the action of the collector is modified, and judgment will issue accordingly.

Plaintiff's counsel thereupon abandoned protest 154869–K only as to the items of forks covered by entry 1509 and also abandoned protest 148361–K, insofar as it relates to merchandise covered by entry 3451, and protest 151934–K, insofar as it relates to merchandise covered by entry 2346. To that extent, protests 154869–K, 148361–K, and 151934–K are dismissed.

Two witnesses were called to testify on behalf of plaintiff. The first witness, Henry O. Ebeling, president of Ebeling & Reuss Company, importer of record, stated that he was familiar with the merchandise before the court, for the reason that he had purchased it. At times, orders are sent to their commissionaire, R. Schenk & Co. in Florence, Italy, which agency places the orders with the firm of Montagnani, Saca, Bercigli of Florence, Italy, manufacturer of the merchandise presently before the court.

As plaintiff's second witness, George W. Kensil, an employee of plaintiff herein, testified that he had taken care of the entry of the various importations in issue and that all of the invoices now before the court had come to his attention. As plaintiff's collective exhibit 1, there were received in evidence invoices prepared by R. Schenk & Co., identifying the shipper's records and invoice numbers.

Interrogatories propounded to Gino Montagnani of Florence, Italy, owner of the manufacturing firm, and his answers, which resulted from the issuance of a commission to take testimony abroad, were admitted in evidence as plaintiff's exhibit 2. The interrogatories and answers in seriatim form were received in evidence as plaintiff's exhibit 2–A.

In answer to the interrogatories propounded to him, Montagnani stated that he had been in his own metal manufacturing business for 30 years. He stated that he buys ingots, composed of copper, zinc, and nickel, for use in his production and that the ingots are guaranteed as regards their composition. He asserted that, in 1947 and 1948, the period during which the merchandise in issue was manufactured and shipped, he was in charge of purchasing the raw materials involved, the production of the manufactured articles, and their sale. He identi-

fied the data as to the various items of merchandise included in the several shipments listed in schedule "A," attached to the interrogatories and answers, as being a correct reflection of his records.

On being asked to outline and explain the manufacturing operations used in producing or manufacturing the articles before the court, he stated:

I melt the metals in the crucible which are then poured into the molds. The articles are taken from the molds, polished and dipped in a silver bath.

He declared that he knew the composition or ingredients which are contained in the raw materials used by his firm, because of his long experience in purchasing and working with materials. It was his statement that the same types of metallic ingredients are present in the completed articles as were contained in the raw materials used in their production, and he later added:

Although the completed articles contained the same types of ingredients as contained in the raw materials, they may have been reduced to some extent during the manufacturing operations because of the variable quality of the fuel available at that time.

He stated that he knew the types of ingredients contained in the articles in issue "Because I supervised and inspected the merchandise." He also declared that he knew the percentages or minimum percentages of each metallic ingredient present in the raw materials used by his firm in producing said items of merchandise for the reason that he "was able to determine the percentage of metallic ingredients in the raw materials from my long experience in working metals" and that an effort was made in the production of the merchandise in issue to have a sufficient quantity of nickel used to assure a nickel content of 12 percent in the finished product.

Montagnani stated that manufacturing complications arose from November 1947 to January 1948, when the materials used did not amalgamate properly, with the result that it affected the nickel content of the merchandise produced during said period. When asked:

Q. How do you know that said manufacturing complications affected the nickel content of said items of merchandise?—A. I learned this when I received the complaint from the customers.

Q. To what extent did said manufacturing complications affect the nickel content of said item?—A. I do not know.

Q. Can you identify any shipments specified in the attached Schedule A that contained no items of merchandise that were affected by said manufacturing complications?—A. All except R. Schenk & Co., invoices No. 47–560, November 10, 1947, No. 47–617, December 5, 1947, and No. 48–19 of January·26, 1948.

He stated that, except for the aforementioned invoices 47–560 (entry 2346), 47–617 (entry 1509), and 48–19 (entry 3451), all of the other shipments contained a definite minimum percentage of nickel content of 12 percent, stating that all of such items "I am sure contained the exact percentage of nickel content."

At this point, plaintiff rested.

Defendant thereupon called as its witnesses Joseph Lamb, chemist in the United States Customs Laboratory at Philadelphia, and Alexander Leach, customs verifier in the United States Customs Service. Defendant's exhibits A–1, B, B–1, B–2, B–3, B–4, B–5, B–6, and B–7 were duly identified by witness Leach, who had 31 years of service with the United States Customs Service and whose duties consisted of unpacking and taking samples from shipments, as having come from entry 1680, covered by protest 148361–K, which was exported from Italy on September 24, 1947, and imported into the United States on October 24, 1947.

Joseph Lamb, when called to testify on behalf of the defendant, stated that he has official records which establish the entry number from which samples were taken for chemical analysis, and that it was said entry 1680.

Government counsel at this point stated that the chemist's report which was in existence would not be offered in evidence, for the reason that it contains items not protested and that, in its stead, the oral testimony of the chemist who had performed the analyses would be introduced.

A summarization of the testimony given by Government chemist Joseph Lamb as to the result of his chemical analyses is here set forth in tabular form:

GOVERNMENT'S SAMPLES IN EVIDENCE       CHEMIST'S TESTIMONY
ALL FROM ENTRY 1680

Protest 146559–K and 8 other protests

| Exhibit No. | Item No. | Lab. No. | |
|---|---|---|---|
| A–1 | 1003 Ice spoon_____ | 2625 | 61.7% copper<br>4.6% nickel; remainder zinc, lead, tin, antimony |
| B | 1004 Salad fork_____ | 2627 | 63.12% copper<br>4.7% nickel |
| B–1 | 1007 Lemon fork_____ | 2629 | 61.6% copper<br>3.4% nickel |
| B–2 | 1008 Paper cutter_____ | 2630 | 2 parts analyzed separately;<br>  Blade: 64.7% copper<br>      4.5% nickel<br>  Handle: 64.0% copper<br>      4.5% nickel |
| B–3 | 10019 Sugar tongs_____ | 2634 | 64.1% copper<br>4.1% nickel |
| B–4 | 10026 Sugar spoon_____ | 2636 | 65.3% copper<br>4.0% nickel |
| B–5 | 10028 Marmalade spoon_ | 2637 | 64.3% copper<br>3.3% nickel |
| B–6 | 10040 Paper cutter_____ | 2640 | 2 parts analyzed separately:<br>  Blade: 65.0% copper<br>      4.6% nickel<br>  Handle: 62.3% copper<br>      4.9% nickel |
| B–7 | 10033 Pin tray_____ | 2639 | 2 parts analyzed separately:<br>  Center portion: 65.9% copper<br>      No nickel<br>  Edge: 61.6% copper<br>      4.2% nickel |
| C | 1006 Cherry picks_____ | 2628 | 65.8% copper<br>3.5% nickel |

All samples were silver plated, but not on nickel silver. In all samples, percentages not shown consisted chiefly of zinc and small amounts of lead, tin, and antimony.

As an overall statement resulting from his analyses, Lamb testified that he found all of the exhibits to be silver plated on brass and that he did not find them to be silver plated on nickel silver.

At the conclusion of the evidence offered on behalf of defendant, plaintiff made the following motion:

We believe that the Government has somehow confused the samples in question, and has taken them out of a subsequent shipment and not out of 1680. It is a very difficult thing to prove, and since that is the only entry on which we are in disagreement, and everything else seems to be uncontradicted insofar as our

testimony is concerned, we are willing to shorten this case, and to avoid a conflict on the only point where there has been conflicting evidence, and to abandon our protest 148361–K insofar as it relates to that particular entry, 1680, thus avoiding all issues of fact in this case. Under the circumstances, it would appear that the testimony introduced by the Government to date all relates to an item that has been abandoned, and I move to dismiss it and strike it out.

Decision on the motion was reserved for action by the division of the court deciding the case.

Inasmuch as a party may abandon his cause of action or part of it, if separable, as in this instance, at any time before decision, protest 148361–K, insofar as it relates to entry 1860, having been abandoned, is dismissed.

In ruling upon the motion to strike out the evidence introduced by defendant, consideration must be given to several factors.

It is provided by the rules of the court that—

### RULE 38. CONSOLIDATION OF ACTIONS

When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

In the present instance, it was upon motion of plaintiff's counsel that the consolidation of the actions presently before the court was ordered.

Inherent in such a consolidation is the fact that there is a common question of law or fact involved, and it follows that evidence presented in such a consolidated case is directed to the subject merchandise as a whole. The trial having proceeded on such a basis to the point that plaintiff has presented its evidence and rested, and the defendant has placed its testimony on the record, plaintiff is estopped in its endeavor to strike from the record testimony offered by the defendant germane to the subject merchandise as a whole by exercising its right to abandon action on 1 entry of the 16 entries covered by the 9 protests originally consolidated for trial. To hold otherwise, would nullify the benefits intended to be derived from consolidation of cases into one cause of action and would put the opposing party in a case such as this to the onerous task of offering proof on every controverted item of merchandise covered by each of the 14 importations still remaining before the court.

It is the opinion of the court that the samples of the imported merchandise introduced by defendant (exhibits A–1, B, B–1, B–2, B–3, B–4, B–5, B–6, and B–7), which were subjected to chemical analysis by defendant's witness Lamb, have been satisfactorily and adequately identified as having come from entry 1680 covered by protest 148361–K. The evidence is likewise clear on the point that said articles were manufactured prior to the period when, Montagnani stated, there was a temporary complication due to faulty amalgamation of raw materials.

Moreover, as opposed to the broad generalizations of plaintiff's witness Montagnani contained in his answers to interrogatories, pertinent references to and extracts of which have been set forth, *supra*, we have before us the actual chemical analyses performed by defendant's witness Lamb.

Predicated on the foregoing factors, the court overrules plaintiff's motion to strike out the testimony offered on behalf of defendant.

In making our ruling, we consider certain elements of the circumstances here present akin in some respects to those present in the case of *Bowles* v. *United States*, 4 Ct. Cust. Appls. 474, T. D. 33885. In that case, various articles, consisting of mugs, jugs, and other articles of decorated earthenware, brass fenders and fire brasses, mahogany table, and other articles of furniture, were claimed to be artistic antiquities entitled to entry free of duty, pursuant to paragraph 717

of the Tariff Act of 1909. In all, there were 380 different articles contained in the shipment.

After reviewing the evidence presented to the court below, the appellate court stated:

The Government urges here that the character of the evidence which we have quoted, including the affidavits, coupled with the action of the importer's counsel in now withdrawing from consideration the articles not mentioned in the shipper's affidavit, makes against the weight to be given to the evidence of the importer himself.

We think this is true. It is a significant fact that after his attention was specifically directed thereto, as shown by the above-quoted evidence, the importer should testify positively that every article of the importation was an antique. Manifestly all were not so, as is now conceded, and we are at a loss to understand why the importer should have so asserted in his evidence or so have entered the merchandise. Importer's counsel ingeniously argued here that he must have been mistaken and could not have meant *all* the articles. The act of his counsel in withdrawing certain merchandise indicates there was a mistake, but if he was mistaken as to so material a part of the importation—namely, to four cases thereof—how can it be said he is correct as to the rest; and if not as to all the rest, as to what part thereof can it be said he is not mistaken?

Some of the factors which have been determinative of the ruling on plaintiff's motion to strike out the evidence tendered by defendant are likewise controlling of the basic issue here presented, namely, whether or not the articles in controversy were silver plated on nickel silver.

In the opinion of the court, the testimony of defendant's witness Lamb, showing, as a result of chemical analysis, that nine different articles which had unqualifiedly been declared by plaintiff's witness Montagnano to contain a minimum of 12 percent of nickel, in fact, contained less than a minimum of 5 percent of nickel agreed upon by counsel for the parties as an essential component constituting an article of nickel silver, leads inevitably to the conclusion that plaintiff has failed in its proof. Therefore, the claim of plaintiff that said articles should have been classified within the provisions of paragraph 355 of the Tariff Act of 1930, as modified, *supra*, as forks with handles of nickel silver or steel other than austenitic, or within the provisions of paragraph 339 of said act, as modified, *supra*, as table or household utensils, silver plated on copper or nickel silver, respectively, is overruled, and the decision of the collector of customs is affirmed as to those items.

Judgment will issue accordingly.